```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
   JULIO RAMIREZ,                                           :
                                   Plaintiff,               :
                                                            :   17 Civ. 7801 (LGS)
                 -against-                                  :
                                                            :   OPINION & ORDER
   YSMAEL JOAQUIN, ET AL.,                                  :
                                   Defendants.              :
                                                            :
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

*Pro se* Plaintiff Julio Ramirez sues six Bureau of Prisons officials and medical staff, under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for their deliberate indifference to Plaintiff's serious medical needs during his detention at the Metropolitan Corrections Center ("MCC"). The claims surround Plaintiff's emergency hernia surgery and his care by prison officials before and after the surgery. Defendants move for summary judgment on all claims. For the reasons below, the motion is granted.

I.  **BACKGROUND**

Except as otherwise noted, the following facts are undisputed and drawn from the Rule 56.1 statement[1] and the parties' submissions.[2]

---

[1] Only Defendants filed a Rule 56.1 Statement ("56.1 Statement"). Plaintiff did not expressly respond to the 56.1 Statement, but much of Defendants' statement is drawn from Plaintiff's own deposition testimony. Under Local Rule 56.1, a party's failure to respond may be construed as the party's conceding the opposing party's version of the facts. But this rule need not apply where, as here, the 56.1 Statement is based largely on Plaintiff's recounting of the facts. *See Alexander v. City of New York,* No. 17 Civ. 3170, 2019 WL 5887300, at *3 (S.D.N.Y. Nov. 8, 2019). Plaintiff's *pro se* status also excuses him from filing a specific response to the 56.1 Statement. *See id.*; *Roland v. Ponte*, No. 17 Civ. 2758, 2018 WL 4609109, at *1 n.1 (S.D.N.Y. Sept. 25, 2018).

[2] In Plaintiff's opposition, he disputes the witness declarations that Defendants submitted. Specifically, Plaintiff objects that the "medical and correctional staff at MCC present a very

Plaintiff, a pretrial detainee, arrived at MCC on May 2, 2017. After experiencing several weeks of severe pain between his legs, Plaintiff was admitted to the emergency room at New York Presbyterian Hospital in Lower Manhattan (the "Hospital"), in the early morning of August 5, 2017. Later that day, he underwent an emergency hernia repair surgery around his right groin. Plaintiff was discharged and returned to MCC on August 6, 2017.

Following the motion to dismiss, only several discrete sets of claims remain. They are *Bivens* claims against: (1) Defendant Ysmael Joaquin, a mid-level medical practitioner, for improper medical care before and after the surgery, (2) Defendants Dr. Robert Beaudouin and Mandeep Singh, a physician's assistant ("PA"), for improper medical care after the surgery and (3) Defendants Andres Naranjo, Deonn Richardson and Rosalind Silvia, who are all corrections officers, for their treatment of Plaintiff after the surgery. The relevant events, as to each Defendant, are described in turn.

### A. Pre- and Post-Surgery Medical Care by Defendant Joaquin

Defendant Joaquin is a medical practitioner at MCC with a role similar to a physician's assistant. A few weeks after Plaintiff first arrived at MCC in May 2017, he began complaining to Defendant Joaquin about his pain, on about five occasions. Defendant Joaquin would encounter Plaintiff in passing while handing out medication to inmates and during inmate "free periods." In response to Plaintiff's complaints, Defendant Joaquin told Plaintiff to e-mail "Sick Call," an internal prison system by which inmates may request medical care, as Defendant

---

different picture in their declarations, a rosy picture that they care about inmates they provide treatment to . . . . Abuse, neglect, and indifference to inmates['] needs including medical concerns and needs in general, has been a common theme for many who have dealt with the MCC Administration. These very declarations presented to the Court a contradiction to what individuals like me go through on a daily basis at MCC."

Joaquin did not have time to examine Plaintiff on the spot.  Defendant Joaquin does not recall these interactions with Plaintiff before his surgery.

After the surgery, upon first returning to MCC from the Hospital on August 6, 2017, Defendant Joaquin examined Plaintiff during a post-operative appointment.  He ordered Acetaminophen/Codeine and Acetaminophen tablets for Plaintiff and arranged for Plaintiff to have an offsite post-surgery follow-up appointment, in accordance with the surgeon's instructions.  Three days later, on August 9, 2017, Defendant Joaquin gave Plaintiff his medication, during the normal medication rounds.  The following day, on August 10, 2017, Plaintiff was examined by another medical practitioner, who found that Plaintiff's surgical site was healing normally, although the site appeared oozy, smelly, sticky and red to Plaintiff.

The next interaction between Plaintiff and Defendant Joaquin described in the record is three months later, on November 19, 2017.  During medication rounds, Plaintiff asked Defendant Joaquin to examine his surgical site due to Plaintiff's ongoing pain.  Defendant Joaquin declined and told Plaintiff to e-mail Sick Call, which resulted in Plaintiff's appointment with an MCC doctor three days later.

According to the Declaration of Wandy Castillo, an inmate housed in the same area as Plaintiff, Mr. Castillo observed Plaintiff, at an unspecified time, ask Defendant Joaquin for medical assistance because Plaintiff's medication was making him "very sick," but Defendant Joaquin "ignored" Plaintiff.  Similarly, per a declaration from fellow inmate Jose Grullon Mendoza, housed in the same area as Plaintiff, Mr. Mendoza heard Plaintiff, at unspecified times, "complaining about his medical condition to officers and medical staff" and "lying in his bed crying over his terrible medical situation."  But "nothing was getting done."

Defendants' expert, Dr. Aaron Manson, a general internist at Columbia University Medical Center and the New York Presbyterian Hospital with forty years of experience, opines

3

that Defendant Joaquin's actions conformed with accepted medical practice.[3]  Specifically, given Defendant Joaquin's position as mid-level practitioner, it was appropriate that he "declined to offer any kind of immediate treatment" upon Plaintiff's request, in favor of Plaintiff's "request[ing] a doctor's appointment" through Sick Call.  "It is accepted medical practice for a mid-level practitioner to refer a patient to his primary care physician regarding general complaints of pain."

### B. Post-Surgery Medical Care by Defendant Singh

Defendant Singh is a physician's assistant.  In the weeks after Plaintiff's August 5, 2017, surgery, Plaintiff continued to have pain.  On August 21 and 22, 2017, he e-mailed Sick Call.  Defendant Singh examined Plaintiff on August 23, 2017, and concluded that Plaintiff's surgery wound was healing typically.  Defendant Singh removed the surgical dressing, even though the Hospital had instructed that the dressing be removed eleven days earlier on August 12, 2017.

In March 2018, Mr. Castillo attests that he observed an exchange between Defendant Singh and Plaintiff at Plaintiff's cell.  Defendant Singh demanded to know why Plaintiff was not taking his medication.  When Plaintiff explained that the medication made his "heart race" and gave him "unusual heart palpitations," Defendant Singh "forcefully" told Plaintiff to take the medication, or he would put Plaintiff in the "Box."  Plaintiff attests in his own declaration that "medical staff" Defendants, like Defendant Singh, regularly threatened to put him in the "Box."  The threats had a very negative "psychological impact" on Plaintiff and left him feeling "humiliat[ed] and dehumanize[ed]," "helpless, hopeless, and empty inside."  Plaintiff also attests

---

[3] Plaintiff objects to the expert medical report because Dr. Manson does not have sufficient context about the events and fails to "address [Plaintiff's] experience as a patient in this process" of obtaining or attempting to obtain treatment.  Plaintiff further argues that "[n]o amount of medical expertise nor expert witness testimony explain my 'pain and suffering' better than me."

that Defendants ignored "treat[ing]" Plaintiff's "mood swings," which resulted from the negative climate Defendants created.

### C. Post-Surgery Medical Care by Defendant Beaudouin

Defendant Beaudouin is a staff physician at MCC. After Plaintiff's surgery, Plaintiff saw Defendant Beaudouin several times in passing, and would request that Defendant Beaudouin examine his surgery wound. Defendant Beaudouin declined to do so immediately because he had "other people to see."

On September 27, 2017, Defendant Beaudouin examined Plaintiff, due to ongoing pain that Plaintiff felt around the surgical site. Defendant Beaudouin concluded that the wound had healed properly, ordered Naproxen for Plaintiff and rescheduled a post-operative follow-up for Plaintiff with a surgeon. It is not clear from the record whether the appointment occurred. A month later, Plaintiff again requested the post-operative appointment, and Defendant Beaudouin made the arrangements on October 27, 2017.

Defendant Beaudouin again examined Plaintiff on November 22, 2017, due to Plaintiff's ongoing complaints of pain. Dr. Beaudouin found that the wound had properly healed and ordered Ibuprofen, Acetaminophen and a CT scan for Plaintiff. The CT scan, conducted on December 6, 2017, revealed that everything was normal, and Defendant Beaudouin reviewed these results with Plaintiff on December 13, 2017.

On February 12, 2018, a prison official called Defendant Beaudouin regarding Plaintiff's complaints of pain. Defendant Beaudouin placed orders for Duloxetine and Acetaminophen for Plaintiff. Three days later, on February 15, 2018, Defendant Beaudouin examined Plaintiff, found the surgery scar was normal and requested a post-operative appointment with a surgeon.

Defendants' expert, Dr. Manson, opines based on his review of Plaintiff's medical records, Plaintiff's messages to Sick Call and deposition transcripts, that Defendants Beaudouin

5

and Singh provided proper post-surgery care. Because Plaintiff's surgery was successful, he experienced no physical complications. Dr. Manson opined that Defendants' regular examination of Plaintiff for his recurring pain was "appropriate." Although Plaintiff's surgical dressings were removed late, "it is consistent with accepted medical practice [that Plaintiff would] remove his own gauze and clean the wound." Nor did Plaintiff's condition require that Defendants immediately respond to complaints of pain. It was appropriate that Defendants directed him instead to schedule appointments through Sick Call. Defendants also provided Plaintiff with "appropriate analgesics for his pain." Dr. Manson concluded that the recurring pain that Plaintiff experienced was from the surgery itself and not the result of any complications from Defendants' treatment or purported delays in treatment.

### D. Post-Surgery Transport by Defendants Naranjo, Richardson and Silvia

The day after the surgery, on August 6, 2017, Defendants Richardson and Naranjo escorted Plaintiff back to MCC in a sedan. Plaintiff asked to ride in an ambulance because he did not believe he could get inside of the car due to his surgery wound. Defendant Richardson demanded that Plaintiff get in the car. Both Defendants Richardson and Naranjo attest that no Hospital employee advised that it was medically necessary to transport Plaintiff back to MCC in an ambulance. Plaintiff testified that Defendant Richardson picked Plaintiff up and put him in the backseat and that he was pulled into the sedan. Plaintiff lay on his side for the half-mile trip back to MCC. Plaintiff testified that, upon arrival, Defendant Richardson pulled him out of the car, placed a cushion on a wheelchair and then helped Plaintiff onto the seat. Both Defendants Richardson and Naranjo wheeled him to a medical examination.

After Plaintiff's medical examination, Defendant Silvia escorted Plaintiff to the base of his cell, which then requires ascending six to ten steps. When Plaintiff declined to walk up the steps due to pain, Defendant Silvia threatened to send Plaintiff to the "Hole." Eventually, she

directed two inmates to carry Plaintiff up the stairs.  They attempted to pick up the wheelchair while Plaintiff was seated, but Defendant Silvia stopped them.  She removed the wheelchair and the inmates carried Plaintiff, each taking one leg and one arm with Plaintiff's head hanging below his body.  Plaintiff testified that it would not have been safe for the inmates to carry Plaintiff while seated in the wheelchair.  Plaintiff also testified that he may have lost consciousness as the inmates carried him.  Mr. Mendoza witnessed this incident.  He attests in his Declaration that, when Plaintiff said he could not walk up the stairs, Defendant Silvia "yelled at all the inmates for no reason, and said that 'if [Plaintiff] does not get off the wheelchair, she was going to put [Plaintiff] in the "Box"' . . . .  The officer then called two inmates to help carry [Plaintiff] to his cell.  The inmates helped support [Plaintiff] but he complained that it was causing him more pain."

      Defendants' expert, Dr. Manson, opined that "[i]t is not medically necessary to discharge patients to their home with an ambulance after routine herniorrhaphies," especially here where there were "no complications."  He further opined that Plaintiff's transport "did not cause any medical complications regarding his surgery or post-operative healing" because there is "no evidence" of any subsequent "wound infection or significant bleeding."  The "mild oozing of blood from the incision" was "normal."  Dr. Manson further opined that Defendant Silvia's "having other inmates carry [Plaintiff] up stairs did not pose a medical risk."  "After a hernia repair surgery, a patient may tolerate movement.  That is further supported in this case, where [the Hospital's] medical professionals reported that [Plaintiff] was 'ambulating well' and 'stable' after his surgery."

## II.  LEGAL STANDARD

      Summary judgment is appropriate if the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

7

R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'"  *Id*. at 114 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (alteration in original).  The evidence is construed in the light most favorable to, and all reasonable inferences are drawn in favor of, the nonmoving party.  *Id*. at 113.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn.  *Id.* at 123.  Although the same standards under Rule 56 apply, special latitude is given to a *pro se* litigant in responding to a summary judgment motion.  *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156-58 (2d Cir. 2017).  "[T]he submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."  *Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018) (alteration in original).

### III.   DISCUSSION

The undisputed evidence shows that Plaintiff cannot prove the *Bivens* claims as a matter of law.  Under *Bivens*, a plaintiff must show that "he has been deprived of a constitutional right by a federal agent acting under color of federal authority."  *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006); *accord Gottesfeld v. Anderson*, No. 18 Civ. 10836, 2020 WL 1082590, at *10 (S.D.N.Y. Mar. 6, 2020).  Deliberate indifference to a federal pretrial detainee's serious medical needs arises under the Due Process Clause of the Fifth Amendment, although case law from the Fourteenth and Eighth Amendment contexts is instructive.  *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017) (Analysis of deliberate medical indifference claims "under the Due Process Clause of the Fourteenth Amendment [as to] state pretrial detainees [is] equally

8

applicable to claims brought by federal pretrial detainees pursuant to the Due Process Clause of the Fifth Amendment." A pretrial "detainee's rights are at least as great as the Eighth Amendment protections available to a convicted prisoner"). A claim of deliberate medical indifference has two elements: "(1) Plaintiff[] had a serious medical need," *i.e.*, "a condition of urgency such as one that may produce death, degeneration, or extreme pain," and "(2) Defendants acted with deliberate indifference to such needs," *i.e.*, Defendants "knew, *or should have known*, that [their actions] posed an excessive risk to [the plaintiff's] health or safety." *Charles v. Orange Cty.*, 925 F.3d 73, 86, 87 (2d Cir. 2019) (emphasis and alterations in original) (analyzing claim under the Fourteenth Amendment). Defendants must have been "personally involved in the claimed constitutional violation." *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009); *accord Gottesfeld*, 2020 WL 1082590, at *10 ("Because the doctrine of *respondeat superior* does not apply . . . [a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates.") (alteration in original) (internal quotation marks and citation omitted).

### A. Serious Medical Need

The primary issue with most of Plaintiff's claims is that he has failed to prove that, during the relevant period, he had a "condition of urgency such as one that may produce death, degeneration, or extreme pain" sufficient for a deliberate medical indifference claim. *See Charles*, 925 F.3d at 86. Except for Defendant Joaquin, Plaintiff's claims are all based on his condition *after* the surgery.[4] The undisputed medical records and Dr. Manson's expert report

---

[4] The Court does not reach the issue of whether Plaintiff's condition *before* surgery was serious enough for *Bivens* liability with respect to the pre-surgery allegations against Defendant Joaquin. Plaintiff does provide evidence, through his deposition and witness declarations, that he was in extreme pain and, eventually, was sent to the emergency room for the hernia surgery, after he allegedly collapsed in his cell. As discussed below, the evidence does not establish that

describe the surgery as "routine," successful, and without complication, and Plaintiff was healing at a normal pace afterward. Immediately after the surgery, Plaintiff was deemed "ambulatory." Although Plaintiff had pain over time, Dr. Manson concluded that the standard analgesics ordered for Plaintiff, like acetaminophen and ibuprofen, were sufficient treatment. This suggests that the severity of Plaintiff's condition was far from "urgen[t]" or risked "death, degeneration, or extreme pain." Although Plaintiff challenges Dr. Manson's report because it lacks context about the frustrating process that Plaintiff had to go through to secure medical care -- *i.e.*, in Plaintiff's words, the "experience" of a patient -- Plaintiff does not dispute Dr. Manson's medical conclusions. The Court is sympathetic to Plaintiff's recurring pain, does not doubt the significant negative effect on Plaintiff physically, psychologically and emotionally, as Plaintiff amply attests in his declaration. But no jury could reasonably conclude on the undisputed evidence that Plaintiff's condition after surgery was severe enough for *Bivens* liability.

### B. Deliberate Indifference

The evidence is insufficient to show that Defendants acted either subjectively or objectively with deliberate indifference to Plaintiff's medical needs, *i.e.*, that Defendants knew or should have known their actions posed an "excessive risk to [the plaintiff's] health or safety." *Id.* (alteration in original); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) ("[M]ere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, *i.e.*, an act or a failure to act [evincing] a conscious disregard of a substantial risk of serious harm") (internal quotation marks omitted).

---

Defendant Joaquin acted subjectively or objectively with deliberate indifference at any time, before or after surgery. Therefore, the *Bivens* claim necessarily fails.

As to the medical Defendants, Dr. Manson's report explains how each one acted within the medical standard of care, before and after the surgery. Given that even malpractice is not enough to state a *Bivens* claim, Defendants' proper discharge of their medical duties also cannot establish excessive risk from an objective viewpoint. Before surgery, Defendant Joaquin followed normal medical protocols by directing Plaintiff to request an appointment so that a doctor could examine his pain. Because Defendant Joaquin is similar to a physician's assistant, it is appropriate, according to Dr. Manson, that he elevated Plaintiff's problem to a doctor. After surgery, Defendants Beaudouin, Singh and Joaquin also regularly examined Plaintiff, ordered him appropriate medication and directed him to make appointments when he complained of pain. Although Defendants would not examine Plaintiff on the spot, his condition did not require emergency treatment after surgery.

Plaintiff's evidence primarily supports a theory that the medical staff Defendants were *subjectively* deliberately indifferent to his serious medical needs. His own and fellow inmates' declarations attest to how Defendants Joaquin and Singh spoke harshly to Plaintiff, threatened to put him in the "Box" if he did not take his medication or follow their orders, ignored his complaints of pain and were not responsive to his requests for an immediate examination. Although these actions might show "indifference" in an everyday sense, "deliberate indifference" has a special legal meaning in the context of Plaintiff's *Bivens* claims. As discussed, where Plaintiff is attempting to prove that Defendants had this subjective state of mind, he must show that Defendants acted *knowing* of the excessive risk of their actions to his health and safety. Even if Defendants' harshness toward Plaintiff were the case, this evidence does not show that they were acting with knowledge that they were endangering him. Indeed, given that the medication they ordered was medically appropriate per Dr. Manson's report, Defendants' harsh tactics to make Plaintiff take his medication aligned with Plaintiff's medical

11

needs. The Court is sympathetic to Plaintiff's testimony that his interactions with Defendants left him feeling "dehumanized." But the effect of Defendants' actions on Plaintiff is a separate issue from Defendants' state of mind when they acted.

As to the corrections officers, the evidence does not establish that Defendants Richardson, Naranjo and Silvia acted with objective or subjective deliberate medical indifference as a matter of law. Dr. Manson's report confirms that these Defendants' transport of Plaintiff after his surgery did not cause any medical complications regarding his surgery and that the use of a sedan was not medically inappropriate. Upon return to MCC, Defendant Richardson placed a cushion on Plaintiff's wheelchair and helped Plaintiff sit down. Although Plaintiff's testimony shows Defendant Richardson spoke harshly to direct Plaintiff into the vehicle and that Plaintiff was pulled in and out of the vehicle, nothing in the record suggests that Defendants knew or should have known that their actions posed any medical or safety risk.

Likewise, Dr. Manson finds that inmates' carrying Plaintiff to his cell, perhaps under Defendant Silvia's direction, was not an objective risk. Assuming Plaintiff's version of the facts, the record also does not show that Defendant Silvia acted with subjective knowledge of excessive risk. The facts raised in Defendant's deposition and an onlooker's declaration suggest that Defendant Silvia was insistent on getting Plaintiff up the stairs: although Plaintiff complained of significant pain and explained that he could not climb the stairs, she yelled at him to get out of his wheelchair, otherwise he would be sent to the "Hole." She rejected the idea of inmates carrying Plaintiff to his cell in his wheelchair, because it was unsafe. Under these circumstances, it is colorable that Defendant Silvia was aware of some risk, given Plaintiff's post-surgical condition. But a jury could not reasonably conclude from the facts construed in favor of Plaintiff that Defendant Silvia "conscious[ly] disregard[ed] . . . a *substantial* risk of *serious* harm." *Cuoco*, 222 F.3d at 107 (emphasis added).

needs. The Court is sympathetic to Plaintiff's testimony that his interactions with Defendants left him feeling "dehumanized." But the effect of Defendants' actions on Plaintiff is a separate issue from Defendants' state of mind when they acted.

As to the corrections officers, the evidence does not establish that Defendants Richardson, Naranjo and Silvia acted with objective or subjective deliberate medical indifference as a matter of law. Dr. Manson's report confirms that these Defendants' transport of Plaintiff after his surgery did not cause any medical complications regarding his surgery and that the use of a sedan was not medically inappropriate. Upon return to MCC, Defendant Richardson placed a cushion on Plaintiff's wheelchair and helped Plaintiff sit down. Although Plaintiff's testimony shows Defendant Richardson spoke harshly to direct Plaintiff into the vehicle and that Plaintiff was pulled in and out of the vehicle, nothing in the record suggests that Defendants knew or should have known that their actions posed any medical or safety risk.

Likewise, Dr. Manson finds that inmates' carrying Plaintiff to his cell, perhaps under Defendant Silvia's direction, was not an objective risk. Assuming Plaintiff's version of the facts, the record also does not show that Defendant Silvia acted with subjective knowledge of excessive risk. The facts raised in Defendant's deposition and an onlooker's declaration suggest that Defendant Silvia was insistent on getting Plaintiff up the stairs: although Plaintiff complained of significant pain and explained that he could not climb the stairs, she yelled at him to get out of his wheelchair, otherwise he would be sent to the "Hole." She rejected the idea of inmates carrying Plaintiff to his cell in his wheelchair, because it was unsafe. Under these circumstances, it is colorable that Defendant Silvia was aware of some risk, given Plaintiff's post-surgical condition. But a jury could not reasonably conclude from the facts construed in favor of Plaintiff that Defendant Silvia "conscious[ly] disregard[ed] . . . a *substantial* risk of *serious* harm." *Cuoco*, 222 F.3d at 107 (emphasis added).

### C. Additional Requests

On June 23, 2020, two letters dated April 27, 2020, and June 15, 2020, from non-party Brandon-Charles McIntyre were docketed on ECF. The letters request -- on behalf of *pro se* Plaintiff -- an extension to supplement Plaintiff's summary judgment opposition and leave to amend the Complaint. On June 24, 2020, a letter from Plaintiff was docketed on ECF, providing an update to his mailing address and information on an incident related to a transfer from MCC to home confinement. On July 2, 2020, Defendants filed a letter opposing these requests. These requests to supplement Plaintiff's summary judgment opposition and to amend the Complaint are denied as moot. The motion for summary judgment was deemed fully submitted and ready for decision since January 22, 2020, when Plaintiff's summary judgment opposition was due after two extensions. The Order dated December 3, 2019, advised that no further extensions would be allowed. Plaintiff's filings through January 22, 2020, including the declarations, were construed as *pro se* Plaintiff's opposition. Additionally, as stated in previous Orders, individuals who are not attorneys may not act on behalf of parties to a lawsuit.

## IV. CONCLUSION

For the reasons above, the motion for summary judgment is GRANTED, and the request to make additional filings and amend the Complaint are DENIED.

The Clerk of Court is respectfully directed to (i) mail a copy of this Order to *pro se* Plaintiff and non-party, Brandon McIntyre, FCI Fort Dix-West, P.O. Box 2000, Joint Base MDL, NH 08640; (ii) correct the docket entry for Dkt. No. 181 to indicate that the letter was sent by Brandon-Charles McIntyre and not Plaintiff Ramirez; and (iii) close Dkt. No. 155 and this action.

Dated: July 6, 2020
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE